J-S35016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.E.A.J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 786 MDA 2025 |

Appeal from the Order Entered May 29, 2025
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  2024-00080

| | | |
|---|---|---|
| IN RE: ADOPTION OF: N.T.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 787 MDA 2025 |

Appeal from the Order Entered May 29, 2025
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  2025-00006

BEFORE:  OLSON, J., MURRAY, J., and LANE, J.

MEMORANDUM BY MURRAY, J.:　　　　　　　**FILED: NOVEMBER 3, 2025**

T.L. (Mother) appeals from the orders granting the petitions filed by the Lackawanna County Office of Youth and Family Services (OYFS or the Agency) and involuntarily terminating Mother's parental rights to N.T.L. (N.L.) (a son

born in April 2012) and N.E.A.J.S. (N.S.) (a daughter born in November 2020) (collectively, Children).[1]  After careful review, we affirm.

The family came to OYFS's attention in December 2019 due to concerns regarding housing instability, poor living conditions, the behavioral/mental health of Mother, and Mother failing to satisfy the basic needs of N.L.  In November 2022, after becoming aware of a roach infestation in Mother's residence, OYFS provided services to assist Mother with her housing issues. OYFS's services included securing Mother and Children a hotel room in December 2022, and "provid[ing] cleaning supplies and transportation for [Mother] to get back and forth from the hotel daily to clean the home."  N.T. (Vol. II), 3/3/25, at 52.  The deplorable living conditions persisted, resulting in law enforcement taking Children into protective custody.[2]  *Id.* at 53.

---

[1] A.E., N.S.'s biological father, and R.L., N.L.'s biological father, voluntarily relinquished their parental rights on May 27 and March 3, 2025, respectively.

[2] The orphans' court noted that it was unclear whether the Agency requested police assistance to remove Children from Mother's care pursuant to an emergency protective order, or whether police investigated Mother's home as the result of a third-party report.  *See* N.T., 5/27/25, at 25.

On January 9, 2023, the orphans' court adjudicated Children dependent.[3, 4] After formulating several permanency plans, the orphans' court adopted the family's final permanency plan on August 22, 2024. The August 2024 permanency plan directed Mother to undergo mental health treatment, ensure a clean and safe home for Children, provide Children with adequate food and clothing, and consistently visit Children. The orphans' court subsequently held several permanency review hearings, and consistently found that Mother made either moderate or minimal progress toward alleviating the circumstances necessitating Children's placement.

On January 29, 2025, OYFS filed substantially similar petitions to involuntarily terminate Mother's parental rights to Children, pursuant to 23 Pa.C.S.A. § 2511(a)(5), (8), and (b). The orphans' court conducted hearings on February 10; March 3, 5, 6, 12; and May 27, 2025. Mother appeared, represented by counsel. Children did not appear, but were represented by a guardian *ad litem* (GAL), who indicated there was no conflict between Children's best and legal interests. N.T., 3/12/25, at 136-37, 142; **see also** Orphans' Court Opinion, 7/8/25, at 21-22 (finding that the GAL was "able to

---

[3] Children have remained in placement since the orphans' court's January 2023 dependency adjudications. Children currently reside with separate foster families, both of which are permanency resources.

[4] The orphans' court observed that N.L. had been removed from Mother's care on two prior occasions (in 2020 and 2021), and N.S. had been removed from Mother's care on one prior occasion (in 2021). Orphans' Court Opinion, 7/8/25, at 34.

represent both [C]hildren's best interest[s] and their legal interest[s] without conflict.").

OYFS presented the testimony of numerous witnesses, including Agency casework supervisor Sharon Roginski (Ms. Roginski); Mother's landlord, Sam Borgia (Mr. Borgia); Friendship House therapist Diane Branning (Ms. Branning); Friendship House outpatient therapist Ashley Carter (Ms. Carter); Allied Services (Allied) human resources director Judy Oprisko (Ms. Oprisko); and Service Access Management, Incorporated (SAM), caseworker Kristie Valera (Ms. Valera).[5] Mother presented the testimony of court-appointed special advocate (CASA) Kamile Gumbs (Ms. Gumbs), and testified on her own behalf.

The orphans' court summarized Ms. Roginski's testimony concerning Mother's visitation with Children:

> Mother had weekly visits from January 2023 until September 2023. N.T. (Vol. II), 3/3/25, at 63. The visits were [supervised] … by the Agency. *Id.* In September 2023, the visits were moved from the Agency to Outreach[ Center for Community Resources (Outreach)].[6] *Id.* … Ms. Roginski told Mother [that] visits could be moved to [Mother's] home[,] but only after [Mother allowed] caseworkers [to assess the home]. *Id.* at 89. In January 2024, the visits were moved to Mother's apartment. *Id.* at 64. They

---

[5] Ms. Valera testified that OYCF contracts with SAM "to engage in casework in certain dependency cases within Lackawanna County[.]" N.T., 3/5/25, at 57-58.

[6] The orphans' court explained that Outreach "is a non-profit [agency] that offers a variety of programs that promote family stability and economic self-sufficiency." Orphans' Court Opinion, 7/8/25, at 8 n.3.

were unsupervised at this time. ***Id.*** In March 2024, N.L. advised [that] he no longer wanted to have visits with [M]other. ***Id.*** at 66. [The Agency referred] Mother and N.L. … to reunification therapy with Jeannie Decker [(Ms. Decker)] …. Those sessions began in July 2024. ***Id.*** Reunification therapy ended with a final session on February 5, 2025, because N.L. requested to have sessions virtually[,] and the provider declined to facilitate virtual therapy sessions. ***Id.***

N.S. continued visiting [] Mother in [Mother's] apartment after N.L. stopped attending. N.S. began having overnight visits at Mother's apartment in April 2024. ***Id.*** at 64. Initially, it was one weeknight, then weekends were added in May 2024. ***Id.*** Mother requested the visits be reduced to every other weekend to accommodate her work schedule. ***Id.*** at 65. On June 12, 2024, N.S. disclosed that Mother hit her.[7] ***Id.*** at 69. Visits were moved back to supervised. ***Id.*** Mother never progressed [] to unsupervised visits again. ***Id.***

Orphans' Court Opinion, 7/8/25, at 15-16 (record citations modified; footnotes added).

Concerning housing, Mr. Borgia testified that United Neighborhood Center (UNC), a housing assistance agency, paid Mother's first two years of rent. N.T. (Vol. I), 3/3/25, at 24-25. Mr. Borgia testified that after UNC's payments ceased, Mother's rental payments were inconsistent. ***Id.*** at 36-37; ***see also id.*** (Mr. Borgia testifying that Mother's rental payments had "been sporadic and less than the amount due"). According to Mr. Borgia, as of March 3, 2025, Mother owed over $1,300 in back rent, and, although not formally initiated, he intended to move forward with eviction proceedings. ***Id.*** at 25.

---

[7] Following a forensic interview of N.S., N.S.'s abuse allegation (*i.e.*, that Mother struck N.S. with a shoe) was deemed unfounded, as Mother "did not use excessive force." N.T., 3/5/25, at 60; N.T., 3/12/25, at 105.

Regarding the condition of Mother's apartment, Mr. Borgia testified that Mother consistently failed to utilize the trash receptacle outside of the apartment building, instead piling garbage on the exposed exterior deck of her third-floor apartment. *Id.* at 25-27, 42. Mr. Borgia testified that this accumulation of garbage attracted animals and pests, including cockroaches. *Id.* at 27, 29-31; *see also id.* at 29 (Mr. Borgia testifying that the cockroach infestation was a "direct result" of Mother's failure to properly dispose of her trash). Mr. Borgia explained that, after discussing the matter with Mother on several occasions, she would begin to place her garbage in the provided receptacle, but consistently reverted to leaving her garbage on her back porch. *Id.* at 30-31. According to Mr. Borgia, Mother's conduct required him to contract with a third-party garbage collection/landscaping company and an exterminator. *Id.* at 31-32.

The orphans' court summarized Ms. Oprisko's testimony regarding Mother's employment with Allied:

> Mother was hired by Allied on August 26, 2019, as a Resident Assistant. N.T. (Vol. I), 3/3/25, at 156. On April 28, 2020, Mother voluntarily transitioned from a full-time employee to a call[-]in or casual employee. *Id.* at 156-57. Mother picks up shifts that are convenient to her schedule. *Id.* From March 2024 until March 3, 2025, Mother worked 735.35 hours. *Id.* at 160. A full-time employee during that same time period would have worked 2[,]080 hours. Mother has the ability to work full-time at Allied. *Id.* at 165. In addition, Mother would be eligible for medical benefits as a full-time employee. *Id.*

Orphans' Court Opinion, 7/8/25, at 9-10 (record citations modified).

Ms. Branning testified that she conducted parent/child interaction therapy (PCIT) with N.S. and Mother to help with the reunification process. N.T. (Vol. I), 3/3/25, at 66. After Mother's initial April 2024 intake, Ms. Branning explained that Friendship House terminated therapy sessions due to Mother's failure to communicate with that agency to schedule sessions. *Id.* at 68.[8] Ms. Branning testified that Mother underwent a second intake session in July 2024, after which Mother attended three PCIT sessions with N.S. *Id.* at 74, 111. Ms. Branning testified that Mother failed to appear for three subsequent sessions, and Friendship House again terminated PCIT services. *Id.* at 85; *see also id.* (Ms. Branning testifying that she referred N.S. to outpatient therapy with Ms. Carter).

Based on her observations, Ms. Branning opined that Mother and N.S. did not have "a parent-child relationship. They obviously … knew each other,

---

[8] Throughout the termination proceedings, several witnesses testified concerning Mother's failure to maintain contact and cooperate with service providers. *See* N.T. (Vol. II), 3/3/25, at 5 (Safe Care program coordinator Christine Sedacky testifying that Mother was discharged from its parent education program for nonattendance); *id.* at 22-26 (Outreach reunification specialist Jailyn Guzman (Ms. Guzman), who was tasked with taking Mother to various appointments, testifying that attempting to schedule appointments with Mother "was like a roller coaster," as Mother would consistently confirm appointments and pick-up times and then not answer her door or communicate with Ms. Guzman); N.T., 3/6/25, at 58 (Ms. Valera testifying that Mother was unsuccessfully discharged from a housing assistance program for noncompliance, as Mother refused to provide paystubs to determine what rental amount she could afford); N.T., 3/12/25, at 106-07 (N.S.'s foster mother testifying that, due to Mother's failure to appear at a number of supervised visitation sessions, Outreach required Mother to confirm visits 24 hours in advance, and to arrive 45 minutes early).

but [Ms. Branning did not observe] a motherly interaction." *Id.* at 81; *see also* N.T. (Vol. I), 3/6/25, at 91 (Agency visitation case aid Joan Morales (Ms. Morales) testifying that, in February 2025, she observed N.S. strike Mother and state "you are not my real mom"). Ms. Branning further opined that the termination of Mother's parental rights would not cause N.S. "undue hardship." *Id.* at 86-87.

Ms. Carter testified that she began therapy with N.S. in September 2024, after Friendship House discontinued Mother and N.S.'s PCIT sessions. *Id.* at 127. Ms. Carter emphasized the importance of structure and consistency in N.S.'s life, and agreed that establishing a "permanent living condition as soon as possible" is in N.S.'s best interests. *Id.* at 150-51.

The orphans' court summarized Ms. Valera's pertinent testimony concerning her conversations with N.L., and Children's relationships with their respective foster families:

> N.L. told Ms. Valera [that] he and N.S. were hit in the past by Mother. N.T., 3/5/25, at 77. [N.L.] said Mother threw objects at N.S. *Id.* N.L. also told Ms. Valera [that] he no longer wanted to attend therapy with [M]other. *Id.* at 85. N.L. told Ms. Valera [that] he witnessed N.S. hit Mother with a hairbrush. N.T., 3/6/25, at 62. [N.L.] said [that] then Mother hit N.S. with the hairbrush. *Id.* [N.L.] said Mother would pick up random objects and "fling" them at N.S. *Id.* N.L. said Mother would say "come get your sister before I hit her." *Id.*
>
> ….
>
> Ms. Valera testified in detail about her [February 11, 2025,] conversation with N.L. …. N.T., 3/5/25, at 110. N.L. said [that] he did not want to return to [M]other. *Id.* [N.L.] said one of the reasons he did[ not] want to return was the condition of Mother's

home. *Id.* [N.L.] said [M]other had a lot of time to rectify the [condition of the home, and N.L.] feared [that] if he returned home, he would be removed again. *Id.* at 110-11. Ms. Valera testified [that] N.L. has been placed in foster care three times. N.T., 3/6/25, at 72. N.L. told Ms. Valera [that M]other had not changed. N.T., 3/5/25, at 111. Ms. Valera asked N.L. if reunification therapy helped with his relationship with [M]other[, and he] said no, their relationship stayed the same. *Id.* at 111-12. N.L. signed a consent for adoption. *Id.*

… [Ms. Valera testified that] N.S. is excelling in placement[ with her current foster family, with whom she had been living for 27 months at the time of the termination hearing]. *Id.* at 114. [Ms. Valera] described N.S. as being very content and happy. *Id.* N.S. told Ms. Valera [that] she wants to stay [with her foster family]. *Id.* Ms. Valera testified [that] N.S. is bonded with her [foster] brothers …. *Id.* Ms. Valera testified N.S. is extremely bonded with her foster parents. *Id.* N.S. refers to [her foster parents] as Mom and Dad. *Id.* N.S. grabs [foster mother,] not wanting to leave her side. *Id.* … N.S. calls [her foster mother's parents] Grandma and Grandpa. *Id.* at 115.

Ms. Valera testified that N.L. is also happy in his current placement. *Id.* at 113. [N.L.] is placed with his football coach [(foster father)] and [foster father's] family…. *Id.* Ms. Valera [testified that N.L.'s] foster parents are one hundred percent committed to [N.L.] *Id.* [N.L.'s foster family is] a permanency resource for [N.L.] *Id.* at 113-14. Ms. Valera testified [that] this is the happiest she has seen N.L. since being placed[, and that] this is the first time she has seen him smile in the whole year she has been on his case. *Id.* at 115. [Ms. Valera testified that,] in her opinion[,] N.L. is extremely bonded with [his foster family]. *Id.*

Orphans' Court Opinion, 7/8/25, at 24-27 (record citations modified).

Concerning Mother's mental health goals, Ms. Valera testified that Mother had not participated in mental health treatment since 2021. N.T., 3/5/25, at 92. Ms. Valera explained that, in 2024, the Agency referred Mother to Omni Health Services (Omni). *Id.* at 92. Mother was discharged in May

2024 "due to her lack of insurance." *Id.* at 92-93. Ms. Valera testified that the Agency referred Mother to a provider that would accept payment from Lackawanna County, but Mother self-discharged (after a period of time that is unclear from the record), indicating "that she no longer needs [mental health] services." *Id.* at 100.

Ms. Gumbs testified based upon her review of the case and her interactions with Mother and Children. N.T. (Vol. I), 3/6/25, 109, 116-18. Ms. Gumbs testified that Mother and N.S. have a mother-daughter relationship. *Id.* at 115. Ms. Gumbs acknowledged N.L.'s preference against reunification; however, Ms. Gumbs expressed concern that N.L.'s motivation was his belief that he would no longer be able to participate in sports if returned to Mother's care. *Id.* at 114. Ms. Gumbs opined that Children and Mother share a positive, beneficial bond. *Id.* at 117-19.

Finally, Mother testified on her own behalf. Mother denied the accuracy of the Agency witnesses' accounts of her progress, claiming that she had frequently attempted to contact OYFS case workers to assist her meet her reunification goals, but seldom received a response. N.T. (Vol. II), 3/6/25, at 22-24; *see also id.* at 20-21 (Mother stating that any difficulty in contacting her was the result of her phone breaking "five or six times" in 2024).

Regarding her housing goal, Mother testified that she had only once allowed trash to accumulate on her deck. *Id.* at 6. Mother claimed that Mr. Borgia's failure to supply her with a key to a deadbolt on her back door made

it difficult to properly dispose of her trash. *Id.* at 5-6. Concerning her mental health goal, Mother testified that she underwent an evaluation at Community Medical Center, which did not recommend mental health treatment. *Id.* at 12-13; *see also id.* at 12 (Mother testifying that she did not sign a release for OYFS to obtain medical documentation from her service provider, because "[n]o one ever asked").

Mother testified that she had never struck N.S., and had only physically disciplined N.L. once, after he allegedly "threw ammonia on [Mother and N.S.]" *Id.* at 19; *see also id.* (Mother testifying that she "spanked [N.L.'s] bottom. … That was only one time."). Mother further opined that she and Children share parent-child bonds. *Id.* at 36, 38.

At the conclusion of testimony, the GAL recommended that the orphans' court terminate Mother's parental rights. N.T., 3/12/25, at 142. In setting forth his recommendation, the GAL emphasized the lengthy duration of Children's respective placements, and Mother's failure to complete her reunification goals. *Id.* at 138-42.

On May 27, 2025, the orphans' court granted OYFS's petitions to terminate Mother's parental rights to Children, stating its findings and reasoning in open court. *See* N.T., 5/27/25, 26-55.[9] Mother timely filed

---

[9] The orders terminating Mother's parental rights (docketed on May 29, 2025) do not specify the grounds for termination under Section 2511(a); however, the orphans' court's on-the-record statement makes clear that the orphans'
*(Footnote Continued Next Page)*

notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements.[10]  Both the orphans' court and Mother have complied with Pa.R.A.P. 1925.

Mother raises the following two issues:

1. Did the [orphans'] court err in concluding that the Agency proved by clear and convincing evidence that statutory grounds for termination [exist] under 23 Pa.C.S.[A.] § 2511(a)?

2. Did the [orphans'] court err in concluding that termination of Mother's parental rights best served the developmental, physical, and emotional needs and welfare of [Children] pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Mother's Brief at 7.

We review the termination of parental rights for an abuse of discretion. *See Interest of N.A.S.*, 338 A.3d 191, 196 (Pa. Super. 2025).  This standard of review requires appellate courts to

accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion.  Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for

_____

court found that OYFS satisfied its burden of proving that termination is warranted under Section 2511(a)(5) and (8).  N.T., 5/27/25, at 30-31, 53-55.

[10] This Court *sua sponte* consolidated Mother's appeals.

- 12 -

applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)); *see also In re Adoption of C.P.D.*, 324 A.3d 11, 24 (Pa. Super. 2024) ("[T]he trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact." (citation and brackets omitted)).

In her first issue, without identifying a specific subsection of Section 2511(a), Mother argues that "the evidence demonstrates that Mother actively pursued reunification, addressed housing … issues, and participated in services. Any delays or disruptions were the result of Agency turnover and systemic obstacles, not parental unwillingness." Mother's Brief at 14.

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court

- 13 -

determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted). "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of C.S.*, 327 A.3d 222, 237 (Pa. Super. 2024) (quoting *In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*)). Finally, this Court need only agree with the trial court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

Instantly, we address Section 2511(a)(8), which provides as follows:

**(a) General rule--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

- 14 -

23 Pa.C.S.A. § 2511(a)(8).

> To satisfy Section 2511(a)(8), the petitioner must prove that
>
> (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. Rather, our inquiry is focused upon whether the at-issue conditions have been remedied such that reunification of parent and child is **imminent** at the time of the hearing.

*In re E.J.C.*, 335 A.3d 1222, 1230-31 (Pa. Super. 2025) (citations and quotation marks omitted; emphasis in original); *see also In re Adoption of G.W.*, 342 A.3d 68, 87 (Pa. Super. filed Jul. 21, 2025) (*en banc*) ("[Pursuant to Section 2511(a)(8),] when one year has elapsed from the children's removal, the General Assembly has relieved the petitioner from the burden of proving that the parent is incapable of, or unwilling to, remedy the conditions, circumstances, or conduct that led to the children's removal."). Moreover, Section 2511(a)(8) **does not** "require an evaluation of the availability or efficacy of [a child protective services agency's] services." *In re Adoption of G.W.*, 335 A.3d at 87 (citation omitted).

Although Section 2511(a)(8)'s first two elements focus on the conduct of the parent, its third element centers on the needs of the child, an area of inquiry generally reserved for the court's Section 2511(b) analysis. Regarding Section 2511(a)(8)'s third element, we have explained that,

while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of the child, as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re E.J.C.*, 335 A.3d at 1231 (brackets omitted) (quoting *In re Adoption*

*of C.L.G.*, 956 A.2d at 1009).

Instantly, the orphans' court rejected Mother's argument that the

Agency failed to prove grounds for termination under Section 2511(a),

reasoning as follows:

[Children's] current placement[s] began [on] December 16, 2022, more than twenty-seven months ago. T[he orphans'] court is satisfied that the Agency has proven by clear and convincing evidence that the conditions which led to the removal of [C]hildren still exist today. … Mother never received a compliance or progress rating above moderate. Mother still lacks safe, stable and suitable housing. [Mother] has not addressed her mental health needs in a manner which could be verified by the Agency. [Mother] was unsuccessfully discharged from the housing program, [the parent education program], and the [PCIT] program. … [Mother] still has only supervised visits with N.S., and N.L. requested [that] visits be stopped al[]together. Mother's employment has been an ongoing concern as well. Mother [] participated in a rental assistance program for a twenty-four-month period[:] from October 2021 through September 30, 2023. In December 2023, the Agency paid $3[,]782.50 to [Mr. Borgia] to cover several months of rent, after the rental assistance program ended. [*See* N.T. (Vol. II), 3/3/25, at 75; *see also* OYFS Exhibit 2 (Photocopy of check).] During this entire period[,] Mother was reporting to the Agency that she was employed full-time at Allied []. The Agency later discovered [that] this was not true. Mother lost her health insurance because she voluntarily reduced her hours of employment at Allied []. The loss of insurance led to [Mother's] inconsistent attendance at Omni for mental health treatment. As such, the Agency secured another provider[,] who would agree to accept payment directly from

> Lackawanna County to pay for Mother's mental health treatment. Mother ultimately withdrew from that treatment provider.

Orphans' Court Opinion, 7/8/25, at 34-35; *see also id.* at 36 (the orphans' court concluding that, "based on all the evidence presented[,] it is in the best interest of [Children] that Mother's parental rights be terminated.").

The orphans' court's factual findings are supported by the record, and its conclusion is free of legal error. *See Interest of K.T.*, 324 A.3d at 56 (stating that "an appellate court must … defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion." (citation omitted)).

Regarding the first two prongs of Section 2511(a)(8), it is undisputed that Children have been removed from Mother's care for more than 12 months, and the record confirms the orphans' court's finding that the conditions that led to Children's removal persist. *See* 23 Pa.C.S.A. § 2511(a)(8). Moreover, and discussed further *infra*, we discern no abuse of the orphans' court's discretion in finding that termination "best serves the needs and welfare" of Children, thus satisfying Section 2511(a)(8)'s third prong. *Id.*

Mother's argument wrongly conflates the requirements of Sections 2511(a)(5) and (a)(8). In doing so, Mother focuses solely on her purportedly continuing efforts to address her "housing … issues, and participate[] in services[,]" and the Agency's alleged systemic failures. Mother's Brief at 14;

*see also* 23 Pa.C.S.A. § 2511(a)(5) (requiring the court to consider, *inter alia*, the parent's ability and willingness to remedy the conditions that led to the child's removal). However, under Section 2511(a)(8), the orphans' court's inquiry was "no longer concerned with whether the parent is capable of change, or whether the parent has tried to change, but [] only [whether] the parent has, in fact, changed." **In re Adoption of G.W.**, 335 A.3d at 87; **see also In re C.L.G.**, 956 A.2d at 1007 ("[W]e emphasize that we will not toll the well-being and permanency of [a child] indefinitely." (citation omitted)). We agree with the orphans' court's determination that Mother has failed to do so. Accordingly, Mother's first issue merits no relief.[11]

In her final issue, Mother challenges termination under Section 2511(b). Mother's Brief at 15. Mother argues that "the record is replete with testimony and exhibits demonstrating that [N.L.] shares a beneficial and significant bond with [] Mother." *Id.*; *see also id.* at 15-16 (quoting Ms. Decker's testimony that "to watch [N.L. and Mother] together, you would not know that they didn't have a great relationship"); *id.* at 17 (highlighting Ms. Gumbs's opinion that termination of Mother's parental rights would "affect [N.S.'s] entire life"). Mother concludes that she "demonstrated progress and commitment[, and

---

[11] Because we agree with the orphans' court that OYFS met its burden with respect to Section 2511(a)(8), we need not address Mother's claim that termination was inappropriate pursuant to Section 2511(a)(5). **See Int. of M.E.**, 283 A.3d at 830.

n]eutral observers confirmed that [Children] benefit from their bond with [Mother]." *Id.* at 19.

When the trial court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. ….

23 Pa.C.S.A. § 2511(b).

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Int. of K.T.*, 296 A.3d at 1105. Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." *Id.* at 1113.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.* (footnote and citations omitted); *see also In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013) (stating that "courts must keep the ticking clock of childhood

- 19 -

ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly.").

Here, the orphans' court explained its Section 2511(b) analysis:

In this case, many witnesses were asked to offer testimony on the existence of a parent-child bond [between Mother and Children], including [Ms.] Roginski, [Ms.] Valera, [Ms.] Morales, [Ms.] Branning, [Ms.] Gumbs, and Mother. The credible and compelling testimony of the Agency witnesses establish[ed] by clear and convincing evidence that neither child shares a parental bond with Mother. The evidence overwhelmingly demonstrates [that C]hildren know Mother, but[,] as [Ms.] Branning likened the relationship, [Mother] is seen more like … an "aunt." N.T. (Vol. I), 3/3/25, at 113. Neither child looks to Mother for their needs, or for their safety and security to be met. As such, [the orphans'] court [found] that in the absence of such a bond, neither child would suffer detrimental harm if parental rights were terminated.

… [B]oth N.S. and N.L. are thriving in foster care. The testimony regarding N.S.[,] and her relationship with her foster family[,] was both credible and compelling. N.S. clings to her foster [m]other and calls her "Mommy." [N.S.] refers to the other foster family members as Dad, brother, grandma, and grandpa. N.S. receives individual therapy to help her understand how to control her emotions and her behavior. At four and a half years of age, N.S. has been in her foster home for nearly two and a half years. She believes her foster family is her true family, as it is the only home she knows.

N.L. has repeatedly expressed his desire to be adopted to both his therapist and case workers. At age 13, he expressed concerns that if he is returned to Mother[,] he will only be removed again. N.L. signed a consent to be adopted. … Ms. Valera testified that in February 2025, it was the first time she had seen [N.S.] smile in more than 14 months …. She said [that N.L.] is bonded with his current foster family and they are bonded to him.

… As such, th[e orphans'] court [found,] based on all the evidence presented[,] that it is in the best interest of [Children] that Mother's parental rights be terminated.

Orphans' Court Opinion, 7/8/25, at 35-36 (citation modified).

We agree with the reasoning and conclusion of the orphans' court, as it is supported by the record and free of legal error. **See Interest of K.T.**, 324 A.3d at 56. The orphans' court acted within its discretion when it credited testimony describing Children as sharing no parental bond with Mother, but having strong bonds with their respective foster families. **See L.C.J.W.**, 311 A.3d at 48 ("It is the province of the orphans' court to assess credibility and resolve any conflicts in the evidence, and in doing so it is free to believe all, part, or none of the evidence presented." (citation and quotation marks omitted)). Accordingly, Mother is entitled to no relief, and we affirm the orders terminating Mother's parental rights.

Orders affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/3/2025